UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARROW INTERNATIONAL, INC. and ARROW INTERNATIONAL INVESTMENT CORP., | ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 05-CV-10671-DPW |
| v. | ) ) | |
| SPIRE BIOMEDICAL, INC., | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

Daniel J. Gleason (BBO # 194900)
Thomas J. Engellenner (BBO # 154460)
Michelle Chassereau Jackson (BBO # 654825)
Heather B. Repicky (BBO # 663347)
NUTTER McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:    (617) 439-2000

*Attorneys for Defendant Spire Biomedical, Inc.*

## TABLE OF CONTENTS

Page

I.    Background…………………………………………………………………………1

II.   Argument……………………………………………………………………………3

      A.    Principles of Claim Construction………………………………………………3

      B.    Claim Construction Issues……………………………………………………...5

            1.    The Extensive Preamble Limits Claim 1……………………………...5

                  a.    The entire preamble is relevant to claim construction……………5

                  b.    The preamble is clearly limiting…………………………………..6

            2.    The Proper Interpretation of "Y-Shaped" Calls For a Perceivable
                  Angle……………………………………………………………………9

            3.    The Step of "Securing" Requires a Connection of the Distal End
                  Portion to the Patient……………………………………………………11

III.  Conclusion……………………………………………………………………………13

# TABLE OF AUTHORITIES

Page

*Bicon, Inc. v. The Straumann Co.*, 271 F. Supp. 2d 368 (D. Mass. 2003)………………………..6

*Bicon v. The Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)…………………………..11, 12

*Bristol-Myers Squibb Co. v. Immunex Corp.*, 86 F. Supp. 2d 447, 450 (D.N.J. 2000)…………...6

*Casler v. United States*, 15 Cl. Ct. 717, 734 (1998), *aff'd*, 883 F.2d 1026 (Fed. Cir. 1989)…….10

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 239 F.3d 801, 808 (Fed. Cir. 2002)……...7, 9

*Cytyc Corp. v. Tripath Imaging, Inc.*, No. C.A. 03-11142-DPW, 2005 WL 3177877 (D. Mass. Nov. 28, 2005) …………………………………………………………………………………7

*Depuy Orthopedics, Inc. v. Androphy*, 53 USPQ2d 1941 (N.D. Ill. 2000)………………………6

*Flexi-Mat Corp. v. Dallas Manf. Co.*, No. C.A. 04-10162-DPW, 2006 WL 962161 (D. Mass. April 11, 2006)………………………………………………………………………………7

*Hunter Douglas Inc. v. Comfortex Corp.*, 98-CV-0479, 1998 U.S. Dist. LEXIS 22162 (N.D.N.Y. 1998)……………………………………………………………………………………………9

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343 (Fed. Cir. 2002)…………………………………9

*Khyber Technologies Corp. v. Casio, Inc.*, No. C.A. 99-12468-GAO, 2004 WL 1790173 (D. Mass. Aug. 11, 2004)………………………………………………………………………...7

*Markman v. Westview Instruments, Inc.*, 570 U.S. 370 (1992)…………………………………...3

*MBO Laboratories, Inc. v. Beckton, Dickinson And Co.*, 385 F. Supp. 2d 88 (D. Mass. 2005)….4

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)……………………………...3, 4, 5, 8, 10

*Poly-America LLP v. GSE Lining Tech. Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004)…………….8

*RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003)..……8

*Skyline Software Systems, Inc., v. Keyhole, Inc.*, C.A. No. 04-11129-DPW, 2006 U.S. Dist. LEXIS 12546 (D. Mass. 2006)…………………………………………………………..4, 10

*Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)…………………3, 4, 8, 10

Defendant Spire Biomedical, Inc. ("Spire") submits this Memorandum in response to Plaintiffs' Claim Construction Brief filed April 12, 2006.

## I.    Background

Hemodialysis, a process by which blood is extracted from a patient and cleaned extracorporeally (outside the body), has been the principal treatment for kidney failure and other renal diseases for at least fifty years. Willem Kolff, of the Netherlands, is widely credited with inventing the first successful hemodialysis machine in 1945.[1]

Since 1945, numerous improvements to the hemodialysis process have been developed. These improvements are partially embodied in the "prior art" that preceded the filing of the patent-in-suit, United States Patent No. 6,872,198 (filed Aug. 23, 2003). For example, by the time the '198 patent application was filed, catheters were being implanted for long-term vascular access. Additionally, a catheter design utilizing two or more separate lumens was well established.[2] This design allows one lumen (the arterial lumen) to extract blood to be cleaned and the other (the veinal lumen) to return blood after metabolic wastes have been removed by filtration.



*Spire's XpressO Multi-lumen Split Tip Catheter*

The efficacy and efficiency of the multi-lumen catheter advanced further with the invention of the "split tip" catheter. The end portion of the split tip catheter that is implanted into the patient's blood vessel is separated into distinct tips that are free to move

---

[1] See Paul Heiney, *The Nuts and Bolts of Life: Willem Kolff and the Invention of the Kidney Machine* (2003) for a detailed account of the life of Willem Kolff and the invention of the first artificial kidney.

[2] *See, e.g.*, U.S. Patent 4,601,701 (filed Feb. 25, 1985); U.S. Patent 4,770,652 (filed July 18, 1986); U.S. Patent 5,405,341 (filed June 3, 1993); U.S. Patent 5,509,897 (filed Feb. 15, 1995).

independently in the blood stream.  The first disclosure of this type of catheter can be found in U.S.

Patent 6,001,079 (filed March 5, 1998) issued to Dr. Pourchez based on a 1995 French filing.  The

'079 Patent teaches that

> [w]hen the distal end of the catheter is placed on the axis of a fluid
> flow such as a bodily fluid flow, [it] allow[s] the end portions, due to
> their flexibility and independence, to act like a sail set parallel to the
> wind and thus are practically not subject to obstruction.
>     In effect, the agitation and flexion of these end portions
> considerably reduce the risk of clogging substances being deposited
> on the surfaces of the perfusing and/or extracting channels with
> which these end portions are equipped.

Both Spire's XpressO® product and Spire's Pourchez RetrO® product are split tip catheters

manufactured under a license of the '079 Patent.

Subcutaneous tunneling, a method used to place the end portion of a catheter at a location

away from the patient's neck, represents another significant development in the field of

hemodialysis.  Both medical and practical benefits can accrue from tunneling the catheter under the

patient's skin.  Most importantly, the catheter is better secured to the patient, greatly reducing the

risk of displacement.  Tunneling also improves the patient's comfort and quality of life as the

awkward end portion of the catheter can exit from an inconspicuous and unobtrusive place on the

patient's body.

There are two ways to tunnel—antegrade (up from the abdomen towards the neck) and

retrograde (down from the neck towards the abdomen).  Both antegrade and retrograde tunneling

were well known techniques when Wilson *et al.* filed their patent application in 2003.  Antegrade

insertion was, and remains, the most widely used catheter implantation method.  Nevertheless,

retrograde subcutaneous tunneling began to gain attention during the time period that the Pourchez

RetrO® was conceived in 2000.  For example, the Tesio® Cath, comprising of two single lumen

catheters, was being implanted by first inserting the device into the vessel and then tunneling the

- 2 -

remaining portion of the device under the skin in a retrograde manner. *See* Ex. A, Undated

Modified Tesio® Cath Brochure. *See also* B. Canaud, et. al, *Permanent Twin Catheter: A Vascular*

*Access Option of Choice for Haemodialysis [sic] in Elderly Patients*, 13 Nephrol Dial Transplant

82, 83 (Supp. 7 1998); R.A. Wheeler, et. al, *Retrograde tunnel: A method for the fixation of long-*

*term pediatric central venous catheters*, 15 J. Parenteral and Enteral Nutrition 114 (1991).

Arrow's brief suggests that the inventors named in the '198 patent made contributions to the

art beyond those actually taught by the '198 patent. There is no support for the assertion that

> . . . Diatek invented both the retrograde tunneling technique and
> catheters adapted for retrograde tunneling . . . . The '198 patent
> teaches a dual lumen chronic hemodialysis catheter . . . .

Diatek did not invent the retrograde tunneling technique. As described above, physicians were

retrograde tunneling single lumen catheters prior to 2003. And, the '198 patent does not teach a

dual lumen chronic hemodialysis catheter. The patent-in-suit is instead directed to only **one**

**method** for implanting a catheter which employs a specific catheter design, a specific method of

retrograde subcutaneous tunneling, and a specific securing of the device to the patient. The claims

in issue and their construction must take into account the state of the art to ensure that the '198

patent receives only that which it is due.

## II.    Argument

### A.    Principles of Claim Construction

Claim construction is a matter of law for the Court to determine. *Markman v. Westview*

*Instruments, Inc.*, 570 U.S. 370, 372 (1992). In doing so, the Court looks first to the claims of the

patent. *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Phillips v.*

*AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a 'bedrock principle' of patent law that

the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'").

Claim terms are to be given their "ordinary and customary meaning." *Phillips*, 451 F.3d at 1312;

*Skyline Software Systems, Inc., v. Keyhole, Inc.*, C.A. No. 04-11129-DPW, 2006 U.S. Dist. LEXIS 12546, *4 (D. Mass. 2006); *MBO Laboratories, Inc. v. Beckton, Dickinson And Co.*, 385 F. Supp. 2d 88, 93 (D. Mass. 2005) ("The court 'must presume that the terms in the claim mean what they say, and unless otherwise compelled, give full effect to the ordinary and accustomed meaning of the claim terms.'").  The ordinary and customary meaning is that meaning "a person of ordinary skill in the art in question at the time of the invention" would attach to the claim.  *Phillips*, 451 F.3d at 1313; *Skyline Software*, 2006 U.S. Dist. LEXIS 12546 at *4; *MBO Labs.*, 385 F. Supp. 2d at 93.  Where, however, the ordinary meaning of the claim may be readily understood by a lay judge, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*, 451 F.3d at 1314; *Skyline Software*, 2006 U.S. Dist. LEXIS 12546 at * 4–5.  The commonly accepted plain English meaning of a word may be gleaned from a general purpose dictionary.  *Id.*

    In addition to examining the claim language, the Court may look to other "intrinsic evidence"—the context in which a term is used, the specification and the prosecution file history.  "The context in which a term is used in the asserted claim and the use of the term in other claims can be 'highly instructive.'"  *Phillips*, 451 F.3d at 1314; *Skyline Software*, 2006 U.S. Dist. LEXIS 12546 at * 5.  The specification also has proven a valuable tool to reveal a patentee's particular definition of a term or terms.  *Phillips*, 451 F.3d at 1316–17; *Vitronics Corp.*, 90 F.3d at 1582; *Skyline Software*, 2006 U.S. Dist. LEXIS 12546 at * 5; *MBO Labs.*, 385 F. Supp. 2d at 94.  Finally, the prosecution file history can provide meaning by demonstrating how the U.S. Patent Office and the inventor understood the claim.  *Phillips*, 451 F.3d at 1317.  Beyond the intrinsic evidence, the Court is free to consider extrinsic evidence—dictionaries, treatises, etc.—to better understand

technical claim terms.  *See Phillips*, 415 F. 3d at 1317–19 (providing a detailed explanation of extrinsic evidence often used and its importance in the claim construction process).

### B.    Claim Construction Issues

Properly construed in light of the prior art, claims 1–3 of the '198 patent recite a very specific method of implanting a catheter into a patient.[3]  The seventy word preamble of claim 1 contains not merely functional language, but rather imports life, meaning and vitality into the claim body.  Specifically, it serves to limit the claim to the implantation of a "double-Y-shaped multi-lumen catheter tube" into a patient.  Y-shaped means shaped like the capital letter "Y."  Finally, the claimed method also requires that one particular part of the catheter—referred to as the distal end portion—be secured to the patient.

### 1.    The Extensive Preamble Limits Claim 1.

### a.  The entire preamble is relevant to claim construction.

The preamble and transition phrase read:

1.    A method for surgically implanting a double-Y-shaped multi-lumen catheter tube into a patient, the multi-lumen catheter including an elongated, central, multi-lumen tube portion, a proximal end portion including a single-lumen proximal veinal extension tube and a single-lumen proximal arterial extension tube each having a proximal tip, and a distal end portion include a single-lumen distal veinal extension tube and a single-lumen distal arterial extension tube each having a distal end, the method compromising:

Arrow treats the "preamble" as if it consists of only the opening clause found in the seventy word description preceding the phrase "a method comprising."  (Arrow Brief  8–9) ("A method for surgically implanting a double-Y-shaped multi-lumen catheter into a patient . . . ").  Arrow offers, and has, no reasoned basis for this self-serving treatment.  The preamble is one of three parts— preamble, transition phrase and body—typically contained in a claim.  See *Bristol-Myers Squibb*

---

[3] **All of the disputed terms are found in claim 1.**

*Co. v. Immunex Corp.*, 86 F. Supp. 2d 447, 450 (D.N.J. 2000). Accordingly, **all** of the language appearing before the transition phrase constitutes the preamble. *Bicon, Inc. v. The Straumann Co.*, 271 F. Supp. 2d 368, 372 (D. Mass. 2003) (finding that the preamble is "that portion of the claim language that precedes the word compromising"); *Depuy Orthopedics, Inc. v. Androphy*, 53 USPQ2d 1941, 1954 n.3 (N.D. Ill. 2000) ("The preamble is the introductory phrase shown before the transition phrase . . . .").

**Arrow is highly selective in defining the claim's preamble. It seeks to eliminate the detailed description of a multi-lumen catheter from the preamble, and places this language, clearly describing the catheter, within the body of the claim. (Arrow Brief 9) ("The body of claim 1 specifically describes the construction of the catheter as including a central body and two single lumen extension tubes located at each end of the catheter."). Arrow parses the language to import some necessary apparatus limitations into the body of claim 1 that suit it yet, at the same time, seeks to exclude those limitations that do not. This selective construction does not comport with any definition of a claim preamble. The preamble contains all seventy words describing the catheter device which appear before the transitional phrase "a method comprising."**

**b. The preamble is clearly limiting.**

This preamble does more than merely introduce the invention by stating its purpose or intended use. Rather, it defines an essential part of the invention. Whether a preamble limits a claim is determined on the facts of the case. *Bicon, Inc. v. The Straumann Co.*, 271 F. Supp. 2d at 371. The Court can resolve the issue "only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 239 F.3d 801, 808 (Fed. Cir. 2002) ("No litmus test defines when a preamble limits claim scope."). The language of the preamble, the '198

patent specification and the '198 patent's prosecution file history reveal that the inventors actually invented, and intended the claim to encompass, a method specifically designed for the surgical implantation of a double-Y-shaped multi-lumen catheter.

"A preamble 'limits the invention if it recites essential structure or steps, or is 'necessary to give life, meaning, and vitality to the claim.'" *Cytyc Corp. v. Tripath Imaging, Inc.*, No. C.A. 03-11142-DPW, 2005 WL 3177877 (D. Mass. Nov. 28, 2005) (citing *Catalina*, 239 F.3d at 808). This preamble, in particular, not only recites an essential structure, but also gives meaning to the claim. The body of the claim, steps (a) through (e), reference the terms "proximal tip," "distal tip," "arterial," "venial," "central tube" and "extension tube." None of these terms, independently, has a clear meaning. Each step in the claimed invention requires one to rely upon the structural description of a double-y-shaped multi-lumen catheter found in the preamble. It is this description together with the term "double-Y-shaped" that define the arrangement and assembly of the catheter's various components. Individually and collectively, the components are vital to practicing the claimed method. There can be no question that this preamble contains "structurally significant information or information to understand the claim body." *Flexi-Mat Corp. v. Dallas Manf. Co.*, No. C.A. 04-10162-DPW, 2006 WL 962161 (D. Mass. April 11, 2006). *See also Khyber Technologies Corp. v. Casio, Inc.*, No. C.A. 99-12468-GAO, 2004 WL 1790173 (D. Mass. Aug. 11, 2004) ("[T]he preamble may be limiting when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention."). The claim, standing alone, does not set forth the complete invention (*See* Arrow Brief 9–10); therefore, the preamble language is limiting.

The specification of the patent is considered "the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315(Fed. Cir. 2005) (quoting *Vitronics v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  By looking to the specification,  Spire

does not ask this Court to read a limitation into the claim from the written description.  *Cf. RF*

*Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003).  Here, the

specification is providing important context for construing the preamble's role, as "when reciting

additional structure or steps underscored as important by the specification, the preamble may

operate as a claim limitation."  *Catalina Mktg.*, 289 F.3d at 808.  The specification discusses at

length the multi-lumen catheter set out in the preamble.  *See* '198 Patent Col. 2, ln. 62–Col. 5, ln.

23.  It describes the catheter as having y-shaped junctions, it describes methods for forming such y-

shaped junctions, and it describes a method for surgically implanting a double-y-shaped multi-

lumen catheter.  *See, e.g.*, '198 Patent Col. 3, ln 64–Col. 4, ln 16; Col. 4, ln 29–Col. 5, ln 6; Col. 5,

lns 24–45; Col. 6, ln 38–Col. 7, ln. 13.  Significantly, too, the invention is expressly titled "*Double-*

*Y-Shaped multi-lumen* catheter with selectivity hubs" (emphasis added), and the accompanying

drawings of the invention primarily depict double-y-shaped multi-lumen catheters.  This

specification, then, demonstrates in several ways that the preamble discloses "a fundamental

characteristic of the claimed invention that is properly construed as a limitation of the claim itself"

– the Y-shaped multi-lumen feature of the catheter in question.  *Poly-America LLP v. GSE Lining*

*Tech. Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (holding that the term "blown-film" used in the

preamble is a limitation on the claims since the specification, including title and summary of the

invention, were replete with references to "blown-film liner").

     The prosecution history of this patent reinforces the role of the preamble to limit the claim.

"[C]lear reliance on the preamble during prosecution to distinguish the claimed invention from the

prior art transforms the preamble into a claim limitation."  *Catalina Mktg.*, 289 F.3d at 808; *In re*

*Cruciferous Sprout Litig.*, 301 F.3d 1343 (Fed. Cir. 2002).  During prosecution, the patentee elected

to prosecute "claims drawn to a method for surgically implanting a double-y-shaped multi-lumen catheter," when informed of a restriction by the U.S. Patent Office.  That election became the basis for the PTO allowance.  Moreover, the Examiner allowed the claims only after expressly finding that "the art of record does not teach or render obvious a method for surgically implanting a *double-y-shaped multi-lumen catheter* tube having the guiding step as claimed, in combination with the steps as set forth in claim [1]."  (Ex. B.) (emphasis added).  In fact, both patentee and Examiner relied heavily upon the description of a double-y-shaped multi-lumen catheter during prosecution to overcome the prior art and to expedite the patent prosecution process.  Such reliance serves to limit the body of claim 1.

Read in context—that is, in light of the patent itself and its file history—the preamble recites a structural limitation that is "necessary to give life, meaning and vitality" to the claim.

### 2.    The Proper Interpretation of "Y-Shaped" Calls For a Perceivable Angle.



*Figure 2 of the '198 Patent*

Because the preamble is limiting, it is necessary to interpret the disputed meaning of the phrase "Y-shaped."  The term is hardly technical.  *See Hunter Douglas Inc. v. Comfortex Corp.*, 98-CV-0479, 1998 U.S. Dist. LEXIS 22162, *11 (N.D.N.Y. 1998) ("'S-shaped' is self-explanatory.").  Webster's Third New International Dictionary defines y-shaped as "having the shape of a capital Y".  Webster's Third New Int'l Dictionary 2655 (1993).  "Y," the twenty-fifth letter in the basic Latin (or Roman) alphabet, has a definite structure and is recognizable because of that structure.  The patent itself depicts a y-shaped apparatus, for example, in Figure 2.  No one would confuse what is depicted with an "I-shaped" or  "T-shaped" structure because of the split ends that form **some perceivable angle** less than 180 degrees.  The ordinary definition of Y-shaped is readily apparent, and the plain

English meaning of this commonly understood term should be applied here. *See Phillips*, 451 F.3d at 1312; *Vitronics Corp.*, 90 F.3d at 1582; *Skyline Software*, 2006 U.S. Dist. LEXIS 12546 at * 4.

Arrow argues for an interpretation of "Y-shaped" that is at odds with common parlance and the drawings of the '198 patent specification. (Arrow Brief 11.) Spire does not quarrel with Arrow's opening proposition that the patent does not limit its device to one specific angle when it describes the assembly of the split tips of each end of the catheter. But, Arrow's argument that "any desired angle" fits the claim is wrong. *See Casler v. United States*, 15 Cl. Ct. 717, 734 (1998), *aff'd*, 883 F.2d 1026 (Fed. Cir. 1989) (unpublished) ("The claims do not call for 'any shape' groove that performs [the] function but, to the contrary, require particular shapes—V-shaped and generally V-shaped, i.e., shaped like or shaped generally like the letter V . . . "). A "Y" cannot be formed by an arrangement of the two tubes at **any** included angle. That suggests, for example, that an angle of either zero degrees, or at the other extreme 350 degrees, would result in something "Y-shaped." Such angles (among many others) simply cannot result in the shape of a "Y."

Moreover, Arrow's proposed definition of "Y-shaped" would render the term meaningless. When the patentee chose "Y-shaped" to describe the catheter, it imposed a limitation on the catheter's design that Arrow now wishes to ignore. "Y-shaped" cannot possibly mean an arrangement with **any** included angle or "Y-shaped" would have no purposeful meaning. "Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous." *Bicon v. The Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). Even the most liberal definition of "Y-shaped" would require a configuration that includes a **perceivable angle** which is less than 180 degrees.[4]

---

[4] The reason behind Arrow's choice of words should be made clear. By disclosing and describing a Y-shaped split tip arrangement the patentee sought to distinguish the invention from the prior art, namely the '079

**3.    "Securing" Means the Fastening of Some Part of the Distal End Portion to the Patient.**

Step (e) of claim 1 requires

> securing at least a portion of the distal end portion of the catheter to the patient.

'198 Patent, Col. 11, lns. 32–33.  Arrow focuses on the method ("sutures or other suitable means") used to secure the catheter.  (Arrow Brief 12.)  Spire does not dispute that various **means** of securing the distal end portion are covered by the claim language.   But, the claim requires more; it instructs that "**at least a portion of the distal end portion**" be secured to the patient by some means.

The parties agree that the term "distal end portion" describes a catheter's second set of split ends which are passed through a subcutaneous tunnel in a patient.  Thus, the "distal end portion" is to be distinguished from the central, multi-lumen tube located in catheter's central region.  The



*Figure 3 of the '198 Patent Showing Distal-End Portion (color added)*

term also notably does not include the "connector hubs" that are attached to the split ends of the distal end portion.

Next, the claim requires securing the distal end portion to the patient.  The term "secure" should be given its ordinary and plain definition since "securing" is not an extraordinary or highly specialized concept.  Webster's defines secure: "to seize and confine;" "hold fast;" "to make fast;" or "tie down."[5]  Webster's Third New Int'l Dictionary 2053 (1993).  Each of these definitions contemplates a subject—the thing secured—and an object—the thing to which it is secured.  In the

---

Patent.  The '079 Patent discloses a split tip design, in which the "end positions, in a rest position of the catheter, extend parallel to the longitudinal axis thereof."  '079 Patent, Abstract.

[5] Although other definitions ("to free from care, fear or anxiety;" "to make safe;" "to come into secure possession of;" "to bring about;" "to release from work or duty") were provided, they are not applicable here.

body of claim 1 (e) both subject and object are identified; the distal end portion is to be secured to the patient.

Arrow now hopes that the Court will read out the term "distal end portion" to impermissibly broaden the claim. "Securing at least a portion of the distal end portion" is not accomplished "so long as the end result is that the catheter is secure." (Arrow Brief 12.) The claim itself describes a more particular way to secure—via a device that ties down the distal end portion to the patient herself. What Arrow proposes by way of a broadening definition of this phrase is flatly at odds with the words used and  is inconsistent with the specification. While a physician may have discretion as to the best **way** to secure the distal end portion, the specification restricts him to securing **that portion**. '198 Patent, Col. 5, lns. 44–54. Arrow's argument substitutes for its own specific claim language a far more expansive concept—one where a secured catheter rather than a secured distal end portion is used as the measure of the claim's meets and bounds. That proposition renders the phrase "at least a portion of the distal end portion" superfluous and is "contrary to the principle that claim language should not [be] treated as meaningless." *Bicon*, 441 F.3d at 950. "Securing" here means the fastening of the distal end portion to the patient.

### III.  Conclusion

The above claim construction properly construes the disputed claim language in question because it is most consistent with the ordinary meaning of the terms used in the claim, with the specification and with the prosecution file history of the '198 Patent.

Dated:  May 15, 2006

 /s/ Heather B. Repicky_____
Daniel J. Gleason (BBO # 194900)
Thomas J. Engellenner (BBO # 154460)
Michelle Chassereau Jackson (BBO # 654825)
Heather B. Repicky (BBO # 663347)
NUTTER McCLENNEN & FISH, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
Telephone:    (617) 439-2000

1528342.2

- 13 -

# MODIFIED TESIO® CATH
## (TWO SINGLE CATHETERS) LONG TERM ACCESS

Unlike traditional double lumen catheters, the Tesio® Cath is first inserted into the vessel and then tunneled. This procedure allows exact placement of the cannulas in the vein before tunneling. The MEDCOMP Modified Tesio® Cath offers the latest cuff design; silicone leads which provide firm anchorage with controlled tissue ingrowth. Tapered leads reduce cuff drag during implantation and linear tissue adherence facilitates in easier removal.



•Lock Right™ adaptor with extensions designate venous and arterial ports while offering ease of blood access.

•Two distinct, long, subcutaneous tunnels are created 8 to 10 cm long, reducing migration of microbial activity.

•Contemporary cuff design provides firm anchorage with controlled tissue ingrowth.

•Two single lumen catheters allow blood flows of 400-450 ml/mn.

•Two free floating lumens independent of each other in the same vessel helps eliminate catheter occlusion by the vein.

•Modified Seldinger approach provides easier and less traumatic access than surgical cut down techniques.

The Tesio® Cath is covered by U.S. Patent No. 5,509,902 and U.S. Patent pending. Medcomp® and Tesio® are registered trademarks of Medical Components, Inc. Lock Right™and Vascu-Sheath™ are trademarks of Medical Components, Inc.

SPI 001646

| *Notice of Allowability* | Application No.     10/231,748 | Applicant(s)    WILSON ET AL. | |
|---|---|---|---|
| | Examiner    Cris L. Rodriguez | Art Unit    3763 | |

-- ***The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *papers filed 8/30/02.*

2. ☒ The allowed claim(s) is/are *24-31.*

3. ☐ The drawings filed on _____ are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

      a) ☐ All   b) ☐ Some*   c) ☐ None   of the:

          1. ☐ Certified copies of the priority documents have been received.

          2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

          3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
             International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☒ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

   (a) ☒ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

       1) ☒ hereto or 2) ☐ to Paper No./Mail Date _____.

   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
      Paper No./Mail Date _____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☒ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☒ Information Disclosure Statements (PTO-1449 or PTO/SB/08),
   Paper No./Mail Date *4*

4. ☐ Examiner's Comment Regarding Requirement for Deposit
   of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)

6. ☐ Interview Summary (PTO-413),
   Paper No./Mail Date _____ .

7. ☒ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____.

**AI 804505**

Application/Control Number: 10/231,748                                    Page 2
Art Unit: 3763

## EXAMINER'S AMENDMENT/COMMENTS

### *Election/Restrictions*

1.      Restriction to one of the following inventions is required under 35 U.S.C. 121:

    I.      Claims 1-17, drawn to a catheter, classified in class 604, subclass 523.

    II.     Claims 18-23, drawn to a method of forming a catheter, classified in class
            264, subclass 239.

    III.    Claims 24-31, drawn to a method for surgically implanting a double-y
            shaped multi-lumen catheter, classified in class 604, subclass 513.

The inventions are distinct, each from the other because of the following reasons:

2.      Inventions II and I are related as process of making and product made.  The
inventions are distinct if either or both of the following can be shown: (1) that the
process as claimed can be used to make other and materially different product or (2)
that the product as claimed can be made by another and materially different process
(MPEP § 806.05(f)).  In the instant, case the process as claimed can be used to make
other and materially different product such as plastic pipes.

3.      Inventions III and I are related as process and apparatus for its practice.  The
inventions are distinct if it can be shown that either: (1) the process as claimed can be
practiced by another materially different apparatus or by hand, or (2) the apparatus as
claimed can be used to practice another and materially different process.  (MPEP §
806.05(e)).  In this case, the process as claimed can be practiced by another materially
different apparatus or by hand such as double catheters.

AI 804506

Application/Control Number: 10/231,748                                         Page 3
Art Unit: 3763

4.      Inventions II and II are unrelated.  Inventions are unrelated if it can be shown that

they are not disclosed as capable of use together and they have different modes of

operation, different functions, or different effects (MPEP § 806.04, MPEP § 808.01).  In

the instant case the different inventions have different functions.

5.      Because these inventions are distinct for the reasons given above and have

acquired a separate status in the art because of their recognized divergent subject

matter, restriction for examination purposes as indicated is proper.

6.      During a telephone conversation with Michael Kenney on February 2, 2004 an

election was made without traverse to prosecute the invention of Group III, claims 24-

31.  Claims 1-23 are withdrawn from further consideration by the examiner, 37

CFR 1.142(b), as being drawn to a non-elected invention.

7.      Applicant is reminded that upon the cancellation of claims to a non-elected

invention, the inventorship must be amended in compliance with 37 CFR 1.48(b) if one

or more of the currently named inventors is no longer an inventor of at least one claim

remaining in the application. Any amendment of inventorship must be accompanied by

a request under 37 CFR 1.48(b) and by the fee required under 37 CFR 1.17(i).

### *Claim Objections*

8.      The numbering of claims is not in accordance with 37 CFR 1.126 which requires

the original numbering of the claims to be preserved throughout the prosecution.  When

claims are canceled, the remaining claims must not be renumbered.  When new claims

are presented, they must be numbered consecutively beginning with the number next

following the highest numbered claims previously presented (whether entered or not).

AI 804507

Application/Control Number: 10/231,748                                     Page 4
Art Unit: 3763

> Misnumbered claims 26, 26 have been renumbered 26 and 27.

### *Examiners Amendment*

9.      This application is in condition for allowance except for the presence of claims 1-
23 to invention non-elected without traverse.  Accordingly, claims 1-23 have been
cancelled.

10.     An **examiner's amendment** to the record appears below. Should the changes
and/or additions be unacceptable to applicant, an amendment may be filed as provided
by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be
submitted no later than the payment of the issue fee.

> Authorization for this examiner's amendment was given in a telephone interview
with Michael Kenney on February 3, 2004.

### Abstract:

> Page 30, line 7 through line 10:  " Each distal extension …. the central tube
portion."  has been deleted.

### Specification:

> On page 1, line 10:  "instrumentation" has been deleted, and –instruments—has
been inserted instead.

> On page 13, line 17:  "The connector hubs."  has been deleted.

> On page 19, line 8:  reference numeral "224" has been deleted, and – 228— has
been added.

### In the claims:

> Claims 1-23 have been canceled.

AI 804508

Application/Control Number: 10/231,748                                    Page 5
Art Unit: 3763

    Claim 27, line 1: "23" has been deleted, and − 24 − has been inserted instead.

### *Reasons for allowance*

11.    The following is an examiner's statement of **reasons for allowance**: the art of record does not teach or render obvious a method for surgically implanting a double-y shaped multi-lumen catheter tube having the guiding step as claimed, in combination with the steps as set forth in claim 24.

    Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

    Any inquiry concerning this communication or earlier communications from the examiner should be directed to Cris L. Rodriguez whose telephone number is (703) 308-2194. The examiner can normally be reached on 7:30 am - 4:00 pm.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Casler can be reached on (703) 308-3552. The fax phone number for the organization where this application or proceeding is assigned is 703-872-9306.

    Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

February 3, 2004

Cris L. Rodriguez
Examiner
Art Unit 3763

L. Thanh
Primary Examiner

AI 804509